This Opinion is a
Precedent of the TTAB

Hearing Date: December 7, 2021                Mailed: June 15, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Made in Nature, LLC*

*v.*

*Pharmavite LLC*

————

Opposition Nos. 91223352 (parent), 91223683 and 91227387

————

Frank G. Long and Cindy A. Villanueva of Dickinson Wright PLLC
    for Made in Nature, LLC.

Peter Bromaghim, Jacob Wharton and Minnie Kim of
    Womble Bond Dickinson (US) LLP
    for Pharmavite LLC.

————

Before Wellington, Heasley and Hudis,
    Administrative Trademark Judges.

Opinion by Hudis, Administrative Trademark Judge:

Pharmavite LLC ("Applicant") seeks registration on the Principal Register of the

standard character mark NATURE MADE for various foods and beverages, spread

over three separate applications, each in a different International Class, as follows:

| Mark | Appln. Ser. No. Filing Date | Goods |
|------|------------------------------|-------|
| NATURE MADE | 85862774 February 28, 2013 | Cereal bars; cereal based energy bars; grain-based food bars; grain-based food bars also containing fruits, dried fruits, fruit juice, grain, vegetables, nuts, seeds, and/or chocolate; granola-based snack bars; chocolate based meal replacement bars; high-protein cereal bars; crackers; bakery products; tea; tea-based beverages; chewing gums; chewing gums with vitamins; candy; caramels; chocolate; chocolate confections; candy mints, energy mints; candy sprinkles; salad dressings; nutritionally-fortified food products in the nature of herbal food beverages, herbal infusions, Cl. 30 |
| NATURE MADE | 85862772 February 28, 2013 | Soy-based food bars; soy-based snack foods; fruit-based meal replacement bars; vegetable-based food bars; nut and seed based snack bars; soy-based beverages used as milk substitutes; yogurts; yogurt-based beverages; soups; preparations for making soups; coffee creamers; creamers for beverages; dried fruits, candied fruit; candied fruit snacks; dried fruit-based snacks; fruit jellies and purees; dried vegetables; dried vegetable in powder form; vegetable-based snack foods; fruit-based snack foods; nutritionally fortified food products in the nature of edible oils, diary-based beverages, and dairy-based snack foods excluding ice cream, ice milk and frozen yogurt, Cl. 29 |
| NATURE MADE | 85862776 February 28, 2013 | Beauty beverages, namely, energy drinks containing nutritional supplements; non-alcoholic beverages with tea flavor; drinking water with vitamins; bottled water; drinking waters; water beverages; carbonated water; flavored waters; essences for making flavored waters; smoothies; energy drinks, soy-based beverages not being milk substitutes, herbal juices, Cl. 32 |

All three applications are based on Applicant's allegation of a bona fide intention to use the mark in commerce under Trademark Act Section 1(b), 15 U.S.C. § 1051(b).

Made in Nature, LLC ("Opposer") opposes registration of Applicant's NATURE MADE mark under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), on the ground that Applicant's mark so resembles Opposer's registered marks set out below as to be

likely to cause confusion, mistake or deception when Applicant's mark is applied to

the goods identified in its applications:[1]

| Mark | Reg. No., Filing Date, Reg. Date, Status | Goods |
|---|---|---|
| MADE IN NATURE (standard characters) | 1779065 August 10, 1989 June 29, 1993 Renewed | Fresh organically grown or wild harvested fruits, Cl. 31 |
| **Made in Nature** organic ("Organic" Disclaimed) | 3528252 March 9, 2007 November 4, 2008 Renewed | Prepared organically grown or wild harvested fruits all being organic, Cl. 29 |
| **Made in Nature** organic ("Organic" Disclaimed) | 3528251 March 9, 2007 November 4, 2008 Renewed | Fresh organically grown fruits, all being organic, Cl. 31 |
| ORGANIC MADE IN NATURE (standard characters) ("Organic" Disclaimed) | 3537789 March 9, 2007 November 25, 2008 Renewed | Prepared organically grown or wild harvested fruits, Cl. 29 |
| MADE IN NATURE (standard characters) | 4804536 August 27, 2012 September 1, 2015 8 & 15 maintenance documents accepted and acknowledged | Dry or aromatized fruit, Cl. 29 |

---

[1] Second Amended Notice of Opposition in Opposition No. 91223352, 60 TTABVUE 3-7; in Opposition No. 91223683, 59 TTABVUE 3-5; and in Opposition No. 91227387, 51 TTABVUE 3-7. Not every registration noted in the chart above was asserted in every opposition. The chart also does not reflect claimed registrations that have since been cancelled, but does reflect claimed applications that have since issued as registrations. The chart conforms to the list of registered marks Opposer asserted as of the time of post-trial briefing. *See* Opposer's Brief, 103 TTABVUE 7-9.

Citations to the record or briefs in this opinion also include citations to the publicly available documents on TTABVUE, the Board's electronic docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry, if applicable.

| Mark | Reg. No., Filing Date, Reg. Date, Status | Goods |
|---|---|---|
| ("Organic" Disclaimed) | 4813368 August 27, 2012 September 15, 2015 8 & 15 maintenance documents accepted and acknowledged | Organic dry or aromatized fruit, Cl. 29 |
| ("Organic" Disclaimed) | 4898945 August 27, 2012 February 9, 2016 8 & 15 Maintenance documents filed | Organic dried fruit-based snacks; organic fruit-based snack food, Cl. 29 |
| MADE IN NATURE (standard characters) | 4964827 August 27, 2012 May 24, 2016 Active | Dried fruit-based snacks; Fruit-based snack food, Cl. 29 |
| ("Organic" Disclaimed) | 5137879 January 31, 2014 February 7, 2017 Active | Organic dehydrated fruit snacks; Organic dried fruit mixes; Organic dried fruits and vegetables, Cl. 29 |
| MADE IN NATURE (standard characters) | 5156469 January 31, 2014 March 7, 2017 Active | Dehydrated fruit snacks; Dried fruit mixes; Dried fruits and vegetables, Cl. 29 |
| ORGANIC MADE IN NATURE (standard characters) ("Organic" Disclaimed) | 3540942 March 9, 2007 December 2, 2008 Renewed | Fresh fruits, namely, organically grown fresh fruits, Cl. 31 |
| MADE IN NATURE (standard characters) | 5921214 March 18, 2016 November 26, 2019 Active | Chocolate covered fruit, Cl. 30 |
| ("Organic" Disclaimed) | 5961771 March 28, 2016 January 14, 2020 Active | Organic chocolate covered fruit, Cl. 30 |

Opposer further claims common law rights in the MADE IN NATURE mark as follows:[2]

| Mark | First Use | Goods |
|---|---|---|
| MADE IN NATURE | In some cases, since as early as 1996 | Dried figs, dried pineapple, dried plums, dried mangos, dried Mission figs, dried apricots, dried bananas, raisins, dates, dried apples, dried cranberries, mixed dried fruits, dried berry mixes, and dried fruit based snacks |

Applicant denied the salient allegations of Opposer's Oppositions in each of its Answers, and additionally asserted the following affirmative defenses:

> 1. Opposer's Notice of Opposition fails to state a claim upon which relief can be granted, and in particular, fails to state legally sufficient grounds for sustaining the opposition.
>
> 2. Applicant reserves all affirmative defenses not stated here in the event that discovery reveals that they may be appropriate.[3]

Applicant's first "affirmative defense" of failure to state a claim upon which relief can be granted is not a true affirmative defense. *Sabhnani v. Mirage Brands, LLC*, 2021 USPQ2d 1241, at *4, n.5 (TTAB 2021) (citing *U.S. Olympic Comm. v. Tempting Brands Neth. B.V.*, 2021 USPQ2d 164, at *4 (TTAB 2021)). In any event, as Applicant neither filed a formal motion to dismiss under Fed R. Civ. P. 12(b)(6) nor argued this asserted affirmative defense in its brief, it is hereby deemed waived. *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014).

---

[2] Second Amended Notice of Opposition in Opposition No. 91223352, 60 TTABVUE 7; in Opposition No. 91223683, 59 TTABVUE 5; and in Opposition No. 91227387, 51 TTABVUE 6.

[3] Answer to Second Amended Notice of Opposition in Opposition No. 91223352, 61 TTABVUE 5; in Opposition No. 91223683, 60 TTABVUE 5; and in Opposition No. 91227387, 52 TTABVUE 5.

Applicant's "attempt to reserve the right to add defenses is improper under the Federal Rules of Civil Procedure, because that would not give … [Opposer] fair notice of such defenses." *Philanthropist.com, Inc. v. Gen. Conf. Corp. of Seventh-Day Adventists*, 2021 USPQ2d 643, at \*4 n.6 (TTAB 2021), *appeal docketed*, No. 21-2208 (Fed. Cir. Aug. 6, 2021); *see also FDIC v. Mahajan*, 923 F. Supp. 2d 1133, 1141 (N.D. Ill. 2013) ("[A]ffirmative defenses that purport to reserve the right to add affirmative defenses at a later date … are stricken because they are improper reservations under the Federal Rules.").

In its Brief, Applicant raises for the first time the *Morehouse,* or prior registration, defense,[4] which Applicant concedes was never raised in its Answers to the Notices of Opposition.[5] Opposer objects to Applicant's assertion of the *Morehouse* defense as untimely.[6] We conclude that Applicant's assertion of the *Morehouse* defense was untimely, was not tried with the express or implied consent of the parties, and in any event does not apply based on the record developed in this case.

The *Morehouse* or prior registration defense is "an equitable defense, to the effect that if the opposer cannot be further injured because there already exists an injurious registration, the opposer cannot object to an additional registration that does not add to the injury." *O–M Bread, Inc. v. U.S. Olympic Comm.*, 65 F.3d 933, 36 USPQ2d 1041, 1045 (Fed. Cir. 1995). The party asserting a *Morehouse* defense must show that

---

[4] Applicant's Brief, 115 TTABVUE 44-47.

[5] *Id.* at 45, n.10.

[6] Opposer's Reply Brief, 117 TTABVUE 9.

it "has an existing registration [or registrations] of the **same** mark[s] for the **same** goods." *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 160 USPQ 715, 717 (CCPA 1969) (emphasis added).

Since Opposer objected to Applicant's assertion of the *Morehouse* defense immediately after Applicant asserted it for the first time in its Brief, this defense was not tried by the parties' express consent. Implied consent to the trial of an unpleaded issue can be found only where the non-offering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue. *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d 1921, 1926-27 (TTAB 2011) (unpleaded tacking and prior registration defenses were not tried by implied consent where petitioner not fully apprised of respondent's reliance on use and registration of another mark), *aff'd*, 188 F. Supp. 3d 22 (D.D.C. 2016), *aff'd*, 743 Fed. Appx. 457, 128 USPQ2d 1172 (D.C. Cir. 2018). There must be no doubt that the nonmoving party is aware that the issue is being tried. *Morgan Creek Prods. Inc. v. Foria Int'l Inc.*, 91 USPQ2d 1134, 1139 (TTAB 2009).

Here, Applicant contends:

> Applicant claimed ownership of Applicant's Registrations, and introduced these registrations into the record. Opposer did not object to these registrations. Thus, there can be no reasonable dispute that Opposer was aware that the registrations formed the basis of a defense, and the prior registration (or *Morehouse*) defense was tried by implied consent.[7]

---

[7] Applicant's Brief, 115 TTABVUE 45, n.10.

True, Applicant did introduce into the record its prior NATURE MADE registrations that are now active,[8] but the only relevance Applicant asserted for these registrations was the "[r]ight to exclude; use and strength of Applicant's mark."[9] This hardly placed Opposer on notice that Applicant sought to rely on the *Morehouse* or prior registration defense at trial and final hearing.

The portions of the discovery and trial deposition testimony of Applicant's witnesses, Rhonda Hoffman and Tobe Cohen, on which Applicant also relies to demonstrate Opposer was on notice of the *Morehouse* defense, comprise discussions of Applicant's finite prior **uses** and contemplated future **uses** of various products in connection with the NATURE MADE mark.[10] This testimony has nothing to do with the various products for which the NATURE MADE mark has been **registered**. Thus, Opposer was not fairly apprised that the evidence was being offered in support of a potential *Morehouse* defense.

In any event, even if Opposer had been on notice that Applicant sought to try the *Morehouse* defense, it does not apply in this proceeding. Applicant's NATURE MADE registrations it made of record recite variations of "nutritional supplements, dietary supplements, vitamin and mineral supplements" and (in some cases) related services in the identifications of goods and services. These goods and services are not identical to, nor are they substantially the same as, the food and drink products for which

---

[8] Applicant's First Notice of Reliance, 88 TTABVUE 3259-3318, 3344-72.

[9] Applicant's First Notice of Reliance, 86 TTABVUE 53-54.

[10] Applicant's Brief, 115 TTABVUE 45-46.

Applicant presently seeks registration of the NATURE MADE mark. Where the goods in the opposed applications "are substantially different goods from those upon which … [Applicant] has its previous registrations …, it cannot be said here that there would be no **added** damage to opposer from … [Applicant's] proposed registration[s]." *Jackes-Evans Mfg. Co. v. Jaybee Mfg. Corp.*, 481 F.2d 1342, 179 USPQ 81, 83 (CCPA 1973) (emphasis original). Therefore, the *Morehouse* defense is inapplicable in this proceeding.

These Oppositions were consolidated by the Board's Order of November 26, 2019, to be presented on the same record and briefs.[11] The Board's file has been maintained in Opposition No. 91223352 as the "parent case." From this point on, all references to the record shall be to Opposition No. 91223352.

The cases are fully briefed. To prevail on its Trademark Act Section 2(d) claim in each Opposition, Opposer must prove by a preponderance of the evidence its entitlement to a statutory cause of action, priority and likelihood of confusion. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000). Having considered the evidentiary record, the parties' arguments and applicable authorities, as explained below, we find that Opposer has carried this burden, and sustain the Oppositions.

---

[11] Consolidation Order in Opposition No. 91223352 entered at 59 TTABVUE; in Opposition No. 91223683 entered at 58 TTABVUE; and in Opposition No. 91227387 entered at 50 TTABVUE 5.

## I.     The Evidentiary Record

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b),

37 C.F.R. § 2.122(b), the files of Applicant's involved applications. In addition, the

parties introduced the following evidence:

### A.     Opposer's Evidence

- Opposer's Notice of Reliance ("O NOR") on Applicant's interrogatory answers, Opposer's asserted registrations, Applicant's opposed applications (which was unnecessary, *see* Trademark Rule 2.122(b)), Applicant's previously-issued registrations for NATURE MADE marks, third-party trademark registrations and website pages showing third-party common law trademark uses, website pages showing news articles mentioning Opposer and its products, and excerpts from Opposer's social media pages and company website [75-76, 81 TTABVUE].

- Opposer's Confidential Notice of Reliance ("O Conf NOR") on portions of the Fed. R. Civ. P. 30(b)(6) discovery deposition transcripts of Applicant's employees Rhonda Hoffman ("Hoffman Discov Depo," with exhibits) and Tobe Cohen ("Cohen Discov Depo," with no exhibits) [77 TTABVUE].

- Public (redacted) and confidential versions of the Testimony Declaration of Opposer's Co-Chairman and Chief Executive Officer, Douglas Brent ("Brent Decl"), with exhibits [78-80, 82 TTABVUE].

### B.     Applicant's Evidence

- Applicant's First Notice of Reliance ("A NOR1") on third-party registrations for marks including the terms NATURE, NATURE'S or MADE [86-89 TTABVUE].

- Applicant's Second Notice of Reliance ("A NOR2") on Opposer's interrogatory answers and supplemental answers, Applicant's own interrogatory answers filed by Applicant pursuant to Trademark Rule 2.120(k)(5), 37 C.F.R. § 2.120(k)(5),[12] portions of the Fed. R. Civ. P. 30(b)(6) discovery deposition transcript of Douglas Brent ("Brent Discov Depo") (confidential, with exhibits), and portions of the Fed. R. Civ. P. 30(b)(6) discovery deposition transcripts of Applicant's employees Rhonda Hoffman ("Hoffman Discov Depo") (confidential, with exhibits) and Tobe Cohen ("Cohen Discov Depo") (confidential, with

---

[12] This was unnecessary, as Opposer filed Applicant's interrogatory answers in their entirety. *See* Trademark Rule 2.120(k)(7), 37 C.F.R. § 2.120(k)(7).

exhibits) filed by Applicant pursuant to Trademark Rule 2.120(k)(4), 37 C.F.R. § 2.120(k)(4) [90-93 TTABVUE].[13]

- Applicant's Amended Second Notice of Reliance ("A Amended NOR2") on Applicant's social media presence and company website, and additional transcript pages and confidential exhibits from the Fed. R. Civ. P. 30(b)(6) discovery deposition of Applicant's employee Rhonda Hoffman ("Hoffman Discov Depo") filed by Applicant pursuant to Trademark Rule 2.120(k)(4) [98-101 TTABVUE].

- Public (redacted) and confidential versions of the transcript from the Cross-Examination Testimony Deposition of Douglas Brent ("Brent Testim CX Depo"), with exhibits [104-105 TTABVUE].

- Public (redacted) and confidential versions of the transcript from the Testimony Deposition of Applicant's Executive Vice President, Chief Growth Officer, Tobe Cohen ("Cohen Testim Depo"), with exhibits [106-109 TTABVUE].

- Public (redacted) and confidential versions of the transcript from the Testimony Deposition of Applicant's Chief Marketing Officer, Rhonda Hoffman ("Hoffman Testim Depo"), with exhibits [110-113 TTABVUE].

### C. Opposer's Rebuttal Evidence

- Opposer's Rebuttal Notice of Reliance ("O Reb NOR") on Opposer's own interrogatory answers and supplemental answers filed by Opposer pursuant to Trademark Rule 2.120(k)(5),[14] and portions of the Fed. R. Civ. P. 30(b)(6) discovery deposition transcript of Douglas Brent ("Brent Discov Depo") (confidential, with exhibits) filed by Opposer pursuant to Trademark Rule 2.120(k)(4) [96-97 TTABVUE].

## II. The Way the Parties filed and Cited to their Evidence

So that the parties, their counsel and perhaps other parties in future proceedings can benefit and possibly reduce their litigation costs, we take a moment to comment on the way the parties filed and cited to their evidence in this Opposition.

---

[13] According to Applicant's Trial Brief, 115 TTABVUE 8-10, Applicant is not relying upon the documents it filed during its trial period at 94-95 TTABVUE.

[14] This was unnecessary, because Applicant had already filed Opposer's interrogatory answers and supplemental answers in their entirety. *See* Trademark Rule 2.120(k)(7).

The parties over-designated as confidential large portions of the record, including discovery deposition transcripts and exhibits, testimony declarations and testimony deposition transcripts. Only the particular exhibits, declaration passages or deposition transcript pages that truly disclosed confidential information should have been filed under seal under a protective order. If a party over-designates material as confidential, the Board will not be bound by the party's designation, and will treat as confidential only testimony and evidence that is truly confidential and commercially sensitive trade secrets. *See* Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."). That is how we are proceeding here. *See, e.g.*, *Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 2020 USPQ2d 10914, at *2 n.13 (TTAB 2020) (Board exercised discretion to "treat as not confidential that material which cannot reasonably be considered confidential" because the "Board must be able to discuss the evidence of record, … so that the parties and a reviewing court will know the basis of the Board's decisions."), *aff'd in part, rev'd in part*, 17 F.4th 129, 2021 USPQ2d 1069 (Fed. Cir. 2021); *AT&T Mobility LLC v. Thomann*, 2020 USPQ2d 53785, at *12 (TTAB 2020) (parties reminded to limit confidential designation to truly confidential or commercially sensitive materials).

The parties also elected to file duplicative evidence by different methods of introduction; for example, once by Notice of Reliance and again by way of an exhibit to a testimony declaration or testimony deposition. The Board views the practice of

introducing cumulative evidence at trial with disfavor. *See Calypso Tech. Inc. v. Calypso Cap. Mgmt. LP*, 100 USPQ2d 1213, 1218 (TTAB 2011) (with its supplemental notice of reliance, plaintiff resubmitted the first 25 items listed in its first notice of reliance, needlessly adding bulk to the record and wasting Board resources).

We further note the way both parties made of record discovery deposition testimony of their own witnesses under Trademark Rule 2.120(k)(4), which provides:

> If only part of a discovery deposition is submitted and made part of the record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party. A notice of reliance filed by an adverse party must be supported by a written statement explaining why the adverse party needs to rely upon each additional part listed in the adverse party's notice, failing which the Board, in its discretion, may refuse to consider the additional parts.

"[T]he interests of fairness are served best by considering … additional excerpts of … [a] discovery deposition [transcript] submitted by … [the adverse party] under [a] [N]otice of [R]eliance." *Weider Pubs., LLC v. D & D Beauty Care Co., LLC*, 109 USPQ2d 1347, 1352 n.13 (TTAB 2014). It is not an appropriate use of Trademark Rule 2.120(k)(4) to introduce unrelated testimony, rather than just the additional necessary portions of discovery deposition excerpts that clarify the passages originally submitted. *See Swatch AG (Swatch SA) (Swatch Ltd.) v. M. Z. Berger & Co., Inc.*, 108 USPQ2d 1463, 1466 (TTAB 2013). We find that both parties to this Opposition are equally guilty of abusing Trademark Rule 2.120(k)(4), and trust that the parties and their counsel will not repeat this practice in future matters before the Board.

Moreover, sizeable portions of each party's evidentiary materials were not pertinent to the issues involved in this rather straightforward priority and likelihood of confusion opposition proceeding, such that the Board was forced to spend needless time sifting through an inappropriately large record in search of germane proofs. *See, e.g.*, *RxD Media, LLC v. IP Application Development LLC*, 125 USPQ2d 1801, 1803 (TTAB 2018) ("Simply put, the parties introduced into the record thousands of pages of testimony and other evidence without regard to what they needed to prove, apparently in the hope that in wading through it, we might find something probative. This is not productive. 'Judges are not like pigs, hunting for truffles buried in … [the record].'"), *aff'd*, 377 F. Supp. 3d 588 (E.D. Va. 2019), *aff'd*, 986 F.3d 361, 2021 USPQ2d 81 (4th Cir. 2021).

Before leaving the subject of their evidentiary **submissions**, we also draw the parties' attention to the following passage from the Board's Manual of Procedure, discussing how evidence should be **cited** in briefs:

> For each significant fact recited, the recitation of facts should include a citation to the portion of the evidentiary record where supporting evidence may be found. When referring to the record in an inter partes proceeding before the Board, parties should include a citation to the TTABVUE entry and page number (*e.g.*, 1 TTABVUE 2) to allow the reader to easily locate the cited materials

Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 801.03 (2022); *see also Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1477 n.6 (TTAB 2014) ("Citations to the record in … [Board] opinion[s] are to the TTABVUE docket entry number and the electronic page number where the document or testimony appears.").

Rather than use full TTABVUE citations with the docket entry and electronic page numbers, the parties used their own numbering system. For exhibits, the parties used the TTABVUE docket number but then cited to exhibits by their assigned exhibit numbers (**without** specifying the TTABVUE page numbers). For testimony submitted by deposition transcripts, the parties used the page and line numbers provided by the court reporters rather than the TTABVUE citations with the docket entry and electronic page numbers. This made it extremely cumbersome to provide evidentiary references for use in this opinion; lengthening the time for review of the record, drafting of the decision and ultimately for issuance of this opinion.

## III. The Parties

Opposer's predecessor in interest was formed in 1989 as a partnership of its two founders, originally focusing on fresh produce, dried fruits and nuts in bulk and in consumer packs as its product lines.[15] The MADE IN NATURE brand and business thereafter passed through several transfers of ownership until being acquired by Opposer in 2003.[16] Over the years, the products offered under the MADE IN NATURE mark have expanded, to where now Opposer offers organic dried fruit, organic toasted coconut chips, organic dried vegetables, organic dried fruits and nuts, organic unbaked energy balls, chocolate covered fruit, fresh fruit and organic cacao fudge.[17]

---

[15] Brent Decl, 79 TTABVUE 3, 243-255, ¶ 3, Exh 26.

[16] *Id.* at 3, ¶ 5.

[17] *Id.* at 5-6, 143-47, ¶ 8, Exh 12; Opposer's Int Ans No 1, A NOR2, 93 TTABVUE 17, 44, 70, 97, 124-27.

Applicant was founded in 1971, aiming to improve health and wellness by focusing on the basics of good nutrition and essential nutrients, supplements, vitamins and minerals.[18] Applicant has been developing, manufacturing and selling vitamins, minerals and supplements under the NATURE MADE brand for over 40 years.[19] The goods that Applicant has sold in connection with the NATURE MADE mark over the past five years supplement one's diet or nutrition with vitamins, minerals, oils, and other essential nutrients and compounds.[20]

## IV.  Entitlement to a Statutory Cause of Action

A plaintiff's entitlement to invoke a statutory cause of action for opposition or cancellation is a necessary element in every inter partes case. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021). To establish entitlement to a statutory cause of action under Trademark Act Section 13, 15 U.S.C., § 1063, a plaintiff must demonstrate "an interest falling within the zone of interests protected by the statute and … proximate causation." *Corcamore*, 2020 USPQ2d 11277, at *4 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067-70 (2014)).[21] Stated

---

[18] Applicant's corporate website, A Amended NOR2, 98 TTABVUE 121-125, 135.

[19] Applicant's Nature Made website, *Id.* at 65-68; Applicant's Int Ans No 14, O NOR, 75 TTABVUE 43, 63, 83.

[20] Applicant's Int Ans No 6, O NOR, 75 TTABVUE 40, 60 80.

[21] Our decisions have previously analyzed the requirements of Trademark Act Sections 13 and 14, 15 U.S.C. §§ 1063-64, under the rubric of "standing." We now refer to this inquiry as entitlement to a statutory cause of action. Despite the change in nomenclature, our prior decisions and those of the Federal Circuit interpreting Trademark Act Sections 13 and 14 remain applicable. *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at *2 (TTAB 2020).

another way, a plaintiff is entitled to bring a statutory cause of action by demonstrating a real interest in the proceeding and a reasonable belief of damage. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *see also Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014).

There is "no meaningful, substantive difference between the analytical frameworks expressed in *Lexmark* and *Empresa Cubana.*" *Corcamore*, 2020 USPQ2d 11277, at *4. Thus, "a party that demonstrates a real interest in [oppos]ing a trademark under [Trademark Act Section 13, 15 U.S.C.] § 106[3] has demonstrated an interest falling within the zone of interests protected by [the Trademark Act] .... Similarly, a party that demonstrates a reasonable belief of damage by the registration of a trademark demonstrates proximate causation within the context of § 106[3]." *See Corcamore*, 2020 USPQ2d 11277 at *7.

Opposer made of record plain copies of its cited registrations, accompanied by the USPTO's Trademark Status & Document Retrieval ("TSDR") registration records, for its pleaded MADE IN NATURE marks.[22] Opposer thus has established its interest in marks similar to the mark sought for registration by Applicant, and thus Opposer's entitlement to bring a colorable claim under Trademark Act Section 2(d). *Cunningham*, 55 USPQ2d at 1844.

---

[22] O NOR, 75 TTABVUE 96-235, Exhs 4-16; largely duplicated at Brent Decl, 79 TTABVUE 26-142, Exhs 1-11. This is only one example of the duplicative evidence filed by both parties in this proceeding.

## V.    Priority

Because Opposer relies on its asserted MADE IN NATURE registrations that have been made of record, and Applicant has not challenged these registrations by way of any cancellation counterclaim(s), Opposer's priority therefore is not at issue with respect to the goods identified in its registrations. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

Applicant, however, argues the following:

> Opposer's overreaching conclusion that its pleaded registrations indisputably establishes it has priority in this proceeding is inaccurate. Opposer's registrations only establish Opposer's priority to use its MADE IN NATURE mark with respect to the goods identified in those registrations—namely, organic fresh and dried fruits and vegetables.
>
> * * *
>
> Opposer's registrations do not confer carte blanche priority to use the MADE IN NATURE mark on the applied-for goods in the subject Applications, particularly in view of the fact that Applicant is the senior user of its NATURE MADE mark overall. The record demonstrates that Applicant's date of first use in commerce of, and common law rights in, the NATURE MADE mark precedes Opposer's use of any mark by over a decade.
>
> * * *
>
> In addition to Applicant's common law rights, Applicant owns Registration Nos. 1,963,505; 3,520,080; 5,938,203; 5,951,312 for the mark NATURE MADE (as well as additional registrations for NATURE MADE-formative marks) in connection with vitamins, dietary, and nutritional supplements, as well as nutrition-related services in some cases. (86 TTABVUE at 53-54, Exhibits 1249-1255, 1259-1260). Opposer does not and cannot challenge Applicant's Registrations, and thus Applicant's priority to use the NATURE MADE mark in connection with the goods recited in those registrations is established.[23]

---

[23] Applicant's Brief, 115 TTABVUE 42-43.

Applicant's expansive arguments regarding its purported priority are misdirected. Applicant is correct that Opposer's rights in its MADE IN NATURE registrations extend solely to the goods identified in those registrations, *King Candy*, 182 USPQ at 110 – generally, fresh fruit, dried fruits and vegetables and chocolate covered fruit. That is the scope of Opposer's rights as afforded by its asserted registrations.

As to Applicant's claim that it has common law priority over Opposer's registered MADE IN NATURE marks, this argument is irrelevant. In a likelihood of confusion proceeding where the opposer relies on registrations, the applicant can claim priority only if it files a counterclaim or separately petitions to cancel the opposer's registrations, *Ultratan Suntanning Ctrs. Inc. v. Ultra Tan Int'l AB*, 49 USPQ2d 1313, 1315 (TTAB 1998), *aff'd without op.*, 230 F.3d 1373 (Fed. Cir. 1999), neither of which Applicant has done here.

## VI.    Likelihood of Confusion

Trademark Act Section 2(d) prohibits the registration of a mark that:

> [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

Our analysis is based on all of the probative evidence of record. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*" – noting the factors to be considered). In making our determination, we consider each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup*

*Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination.").

In applying the *DuPont* factors, we bear in mind the fundamental purposes underlying Trademark Act Section 2(d), which are to prevent confusion as to source and to protect trademark owners from damage caused by the registration of similar marks for related goods or services that are likely to cause confusion. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 331 (1985); *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163 (1995); *DuPont*, 177 USPQ at 566.

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). We discuss below these factors, and the other *DuPont* factors for which there is evidence and argument.

### A.   Strength of Opposer's Marks

Before we evaluate the similarity or dissimilarity of the parties' marks, we first consider the strength of Opposer's asserted marks. The fifth *DuPont* factor enables Opposer to prove that its pleaded marks are entitled to an expanded scope of protection by adducing evidence of "[t]he fame of the prior mark (sales, advertising,

length of use);" the sixth *DuPont* factor allows Applicant to contract that scope of protection by adducing evidence of "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 177 USPQ at 567, *cited in Sock It To Me, Inc. v. Aiping Fan*, 2020 USPQ2d 10611, at *8 (TTAB 2020).

The strength of Opposer's marks affects the scope of protection to which they are entitled. Thus, we consider Opposer's marks' conceptual strength, based on the nature of the marks themselves, and their commercial strength, based on marketplace recognition of the marks. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength ...."). The commercial strength of the mark also is affected by the number and nature of third-party uses of similar marks for similar goods. *DuPont*, 177 USPQ at 567.

### 1. Conceptual Strength

As Opposer's MADE IN NATURE marks are registered on the Principal Register without a claim of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f), they are presumed to be inherently distinctive for the goods and services recited in those registrations. *Tea Bd. of India v. Republic of Tea, Inc.*, 80 USPQ2d 1881, 1889 (TTAB 2006). Challenging the inherent strength of Opposer's marks, Applicant states that "Opposer's MADE IN NATURE Marks, as used in connection with Opposer's registered goods, is as conceptually weak as a brand can be and still qualify for trademark protection."[24] In support of this argument,

---

[24] Applicant's Brief, 115 TTABVUE 35.

Applicant quotes the following passage from the Fed. R. Civ. P. 30(b)(6) discovery deposition of Opposer's representative, Douglas Brent:[25]

> Q. … What would you say are the distinctive characteristics of the text mark "Made In Nature?"
> A. Me?
> Q. Yes.
> A. I think that it's obviously descriptive. I mean the products that are inside these bags are not made in a lab. They're Made In Nature. And, you know, it's hard if you're Häagen-Dazs, that doesn't tell the consumer anything. But I think the "Made In Nature" is -- tells people what to expect when they look inside the bag.

Mr. Brent's further discovery deposition testimony continues on this theme:[26]

> Q. Would you say that the Made In Nature mark creates a commercial impression?
> …
> A. … [I]f they turn the bag around, a bag of organic figs, and the only thing that's in it is one ingredient, organic figs, then that's reinforced. That name and that initial recognition might give a person the reason and motivation to pick the bag up is reinforced. We have to be true to that. We have to be careful not to -- and we are super careful not to compromise on that by putting in stuff that's not made in nature.

"Nature" is defined as "all the features, forces, and processes that happen or exist independently of people…."[27] "Made" is the "past simple and past participle of 'make'," which in turn means "to produce something, often using a particular substance or material."[28] These definitions support Mr. Brent's above-quoted

---

[25] Brent Discov Depo, 90 TTABVUE 73-74.

[26] *Id.* at 74-75.

[27] CAMBRIDGE DICTIONARY (https://dictionary.cambridge.org/dictionary/english/nature, last visited April 5, 2022). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *See In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014) *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016).

[28] CAMBRIDGE DICTIONARY (https://dictionary.cambridge.org/dictionary/english/made and https://dictionary.cambridge.org/dictionary/english/make, last visited April 5, 2022).

comments that "Made in Nature" denotes products that are not made in a lab and that have no extra man-made ingredients. As the Fed. R. Civ. P. 30(b)(6) witness for Opposer, Mr. Brent's comment that MADE IN NATURE is "descriptive" is an admission relevant to the conceptual strength of the mark.

However, an admission made by a Rule 30(b)(6) representative is not a judicial admission, which is incapable of refutation, but only an evidentiary admission. *See, e.g., Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1260–61 (10th Cir. 2016) ("[T]he testimony of a Rule 30(b)(6) witness is merely an evidentiary admission, rather than a judicial admission, … and … [is] not give[n] … conclusive effect."). Thus, Mr. Brent's comment is but one piece of proof in the total universe of the evidence of record relevant to the factual issue of the mark's strength, and we must consider all evidence relevant to this question. Further, we are concerned that Mr. Brent, as a lay witness, may not understand the legal meaning of descriptiveness in trademark law.

Seeking to bolster its argument that Opposer's MADE IN NATURE marks are inherently weak, Applicant maintains "[i]t is … not surprising that the food and beverage field is crowded with marks with the elements 'made' and/or 'nature.' Applicant has introduced hundreds of such registrations into the record …."[29] In fact, choosing quantity over quality, Applicant purports to have submitted 975 third-party registrations to support its position.[30] A closer examination of Applicant's third-party

---

[29] Applicant's Brief, 115 TTABVUE 35.

[30] A NOR1, 86 TTABVUE 2-682, 87 TTABVUE 2-1660, 88 TTABVUE 2-3372 and 89 TTABVUE 2-546. Applicant apparently was so embarrassed by the over-abundance of material submitted that it included a footnote apologizing to the Board for having done so.

registration evidence discloses that these materials are not as supportive of its position as Applicant claims.

"[T]hird-party registration evidence that does not equate to proof of third-party use may bear on conceptual weakness if a term is commonly registered for similar goods or services." *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1057 (TTAB 2017); *see also Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693, 694 (CCPA 1976) (third-party registrations "may be given some weight to show the meaning of a mark in the same way that dictionaries are used"). However, for a number of reasons, we must discount the probative value of a majority of the third-party registrations Applicant provided.

Opposer's MADE IN NATURE marks are registered for fresh fruit, dried fruits and vegetables, and chocolate covered fruit. The third-party registrations of NATURE or MADE marks that Applicant submitted for products other than Opposer's identified goods have little or no probative value in showing the conceptual weakness of the terms NATURE or MADE in Opposer's marks. *See In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017) (disregarding third-party registrations for other types of goods where the proffering party had neither proven nor explained that they were related to the goods in the cited registration). Examples: NATURE'S WAY, Reg. No. 2684030 for "poultry, meats, and fish; parts from poultry, meats, and fish; and further-processed poultry, meats, and fish" (86 TTABVUE 593-

---

Applicant's Brief, 115 TTABVUE 35-36, n.9. Applicant's apology is no substitute for appropriately culling its evidentiary submissions in the first instance.

600, Exh 375) and NATURE NATE'S, Reg. No. 4771354 for "honey; pancake syrup; table syrup; topping syrup" (88 TTABVUE 45-53, Exh 668).

Applicant's third-party registration evidence also includes marks containing additional elements, trademark formatives of different grammatical syntax or having a differing overall commercial impression, rendering many of them less similar to Opposer's marks than Applicant's mark. *Sabhnani*, 2021 USPQ2d 1241, at *25; *Cf. In re Inn at St. John's*, 126 USPQ2d 1742, 1745-46 (TTAB 2018) (discounting probative value of third-party registrations "contain[ing] the nonidentical term 'Fifth'" in showing that the cited registered mark 5IVESTEAK was weak), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019). We thus afford many of Applicant's third-party registrations low probative value. Examples: NATUREWELL, Reg. No. 3117954 (87 TTABVUE 144-149, Exh 415); THE NATURE OF WATER, Reg. No. 3229240 (87 TTABVUE 203-208, Exh 425); NATURIPE SNACKS, Reg. No. 5531219 (88 TTABVUE 1454-1459, Exh 896) and MADE IN PALESTINE, Reg. No. 5420110 (1253-1258, Exh 862).

Applicant's evidence further contains third-party registrations that are not based on use in commerce; but rather issued under Trademark Act Sections 44(e) or 66(a), 15 U.S.C. §§ 1126(e) or 1141f(a), based on the foreign trademark owners' home country registrations or as extensions of protection to the United States based on an international registration – and have been registered for less than five years. Accordingly, they lack probative value, and we have not considered them. *In re 1st USA Realty Pros. Inc.,* 84 USPQ2d 1581, 1583 (TTAB 2007) ("To the extent that the

registrations are based on Section 44 or Section 66 of the Trademark Act, applicant's objection is well-taken. Because these registrations are not based on use in commerce they have no probative value in showing the relatedness of the services.…"). Examples: NATURE'S PATH, Reg. No. 5969970 (88 TTABVUE 2197-2202, Exh 1021 – registered under Trademark Act Section 44(e) in 2020) and TOKYO MILK CHEESE FACTORY SINCE 2011 SWEETS OF GOOD MILK & CHEESE. - MADE IN JAPAN, Reg. No. 6044706 (88 TTABVUE 2289-96, Exh 1036 – Registered under Trademark Act Section 66(a) in 2020).

Applicant's proofs that we totally disregard include a significant number of pending and abandoned trademark applications, and cancelled trademark registrations. Third-party applications are evidence only of the fact that they have been filed, *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1270 n.8 (TTAB 2009), and have no other probative value, *Interpayment Servs. Ltd. v. Docters & Thiede*, 66 USPQ2d 1463, 1468 n.6 (TTAB 2003). Abandoned applications have "'no probative value other than as evidence that the applications [were] filed.'" *Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 USPQ2d 1399, 1403 n.4 (TTAB 2010) (quoting *In re Phillips-Van Heusen Corp.*, 63 USPQ2d 1047, 1049 n.4 (TTAB 2002)).

A cancelled or expired registration has no probative value other than to show that it once issued and it is not entitled to any of the statutory presumptions of Trademark Act Section 7(b). *See Action Temp. Servs. Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989) ("a cancelled registration does not provide

constructive notice of anything."); *In Re Ginc UK Ltd.*, 90 USPQ2d 1472, 1480 (TTAB 2007); *Sunnen Prods. Co. v. Sunex Int'l Inc.*, 1 USPQ2d 1744, 1747 (TTAB 1987).

Applicant also made of record Opposer's own active and cancelled registrations and active and abandoned applications, as well as Applicant's own active and cancelled registrations and active and abandoned applications.[31] By definition, these are not "third-party registrations."

Finally, Applicant listed a number of third-party registrations in its First Notice of Reliance that were not included as exhibits.[32] All that Applicant provided were the marks and their registration numbers. This mere list of registrations does not serve to introduce the registrations into evidence and thus has no probative value. *See In re Peace Love World Live, LLC*, 127 USPQ2d 1400, 1405 n.17 (TTAB 2018) ("[T]he list does not include enough information to be probative. The list includes only the serial number, registration number, mark, and status (live or dead) of the applications or registrations. Because the goods are not listed, we do not know whether the listed [applications or] registrations are relevant.").[33]

Stripped of the third-party registrations and applications that have no or low probative value, we are left with 90 relevant third-party registered marks that Applicant made of record which include either the term NATURE or the term MADE

---

[31] *See* A NOR1, 86 TTABVUE 314-331, Exh 331, 87 TTABVUE 330-354, Exhs 446-47, 88 TTABVUE 114-125, 139-150, 307-314, 434-445, 719-725, 753-759, 1147-1154, 2087-2092, 2173-2179, 3259-1260, Exhs 678, 681, 709, 729, 775, 781, 844, 1002, 1017, 1249-60 and 89 TTABVUE 2-546, Exhs 1261-79.

[32] A NOR1, 86 TTABVUE 44-45, marks listed as Exhs 1051-80.

[33] *See also Weider Publ'ns*, 109 USPQ2d at 1351-52 (duty of the party making submissions to the Board via ESTTA to ensure that they have been entered into the trial record).

for goods related to Opposer's fruit, vegetable or snack products – less than ten percent of Applicant's submissions. Applicant's submission of these third-party registrations only succeeded in persuading us that the terms NATURE and MADE, each term standing by itself rather than together as part of an overall mark registered in connection with relevant consumable products, are respectively weak trademark elements in connection with such goods. Showing the weakness of the individual terms in Opposer's marks does not definitively establish the weakness of those two terms used in close proximity.[34]

Only eight of the third-party registrations Applicant submitted contain both the words NATURE and MADE (six with the same owner), all of which we have discounted on the basis of different commercial impressions or irrelevant goods:

| Mark and Registration | Goods | Owner | Record Citation |
|---|---|---|---|
| UNCLE RAY'S MADE FRESH FROM | Potato-based snack foods, namely potato | Uncle Rays, LLC | 86 TTABVUE 469-473, Exh 353 |

---

[34] Applicant's admissible and relevant examples of NATURE marks include: NATURE'S ORCHARD, Reg. No. 1403320 (86 TTABVUE 202-11, Exh 317); NATURE'S HARVEST, Reg. No. 1834185 (86 TTABVUE 337-50, Exh 333); NATURE'S ORIGINAL, Reg. No. 2586490 (86 TTABVUE 540-43, Exh 366); NATURE'S PROMISE, Reg. No. 3091369 (87 TTABVUE 119-28, Exh No 412); BACK TO NATURE, Reg. No. 3463095 (87 TTABVUE 281-87, Exh 439); NATURE SNACKS, Reg. No. 3649268 (87 TTABVUE 436-41, Exh 461); SIMPLY NATURE, Reg. No. 4765257 (88 TTABVUE 39-44, Exh 667); BARE NATURE, Reg. No. 4923275 (88 TTABVUE 353-58, Exh 716); and ALL OF NATURE, Reg. No. 5514412 (88 TTABVUE 1407-13, Exh 888).

Applicant's admissible and relevant examples of MADE marks include: REESE'S THE ORIGINAL MILK CHOCOLATE COATED PEANUT BUTTER CUPS "MADE IN CHOCOLATE TOWN SINCE 1923 SO THEY MUST BE GOOD," Reg. No. 4148621 (87 TTABVUE 791-99, Exh 522); MADE WITH NATURAL CALIFORNIA PISTACHIOS, Reg. No. 4610573 (87 TTABVUE 1374-80, Exh 613); HEALTH CRUNCH ARTISINAL KALE FOODS MADE IN SMALL BATCHES, Reg. No. 5098808 (88 TTABVUE 658-63, Exh 765); and FRENCHBURGERS MADE IN  CHEF, Reg. No. 5179259 (88 TTABVUE 792-97, Exh 787).

| Mark and Registration | Goods | Owner | Record Citation |
|---|---|---|---|
| NATURE'S BEST! and Design<br>Reg. No. 2382643 | chips and potato crisps, Cl 29 | | |
| UNCLE RAY'S MADE FRESH FROM NATURE'S BEST!<br>Reg. No. 2500545 | Potato-based snack foods, namely potato chips and potato crisps, Cl 29 | Uncle Rays, LLC | 86 TTABVUE 507-511, Exh 360 |
| UNCLE RAY'S MADE FRESH FROM NATURE'S BEST! and Design<br>Reg. No. 2540553 | Corn based snack foods, namely, corn chips, processed popped popcorn, candy coated popcorn, caramel popcorn, puffed corn snacks, and cheese flavored puffed corn snacks, Cl 30 | Uncle Rays, LLC | 86 TTABVUE 525-519, Exh 363 |
| UNCLE RAY'S ALWAYS MADE FRESH FROM NATURE'S BEST! and Design<br>Reg. No. 2545097 | Potato-based snack foods, namely potato chips and potato crisps, Cl 29 | Uncle Rays, LLC | 86 TTABVUE 520-534, Exh 364 |
| UNCLE RAY'S ALWAYS MADE FRESH FROM NATURE'S BEST! and Design<br>Reg. No. 2853774 | Tortilla chips; Nachos; Pretzels, Cl 30 | Uncle Rays, LLC | 86 TTABVUE 673-677, Exh 389 |
| UNCLE RAY'S ALWAYS MADE FRESH FROM NATURE'S BEST!<br>Reg. No. 2945072 | Cheese flavored snacks, namely, cheese curls; Tortilla chips; Nachos; Pretzels, Cl 30 | Uncle Rays, LLC | 87 TTABVUE 39-43, Exh 398 |
| MADE WITH NATURAL CALIFORNIA PISTACHIOS and Design (all terms disclaimed)<br>Reg. No. 4610573 | Processed nuts; roasted nuts; seasoned nuts; shelled nuts; processed nut pieces; flour made of nuts; paste made of nuts, Cl 29 | American Pistachio Growers | 87 TTABVUE 1374-1380, Exh 613 |
| K & B SODAS MADE IN WASHINGTON, DC ORIGINAL & ALL NATURAL GINGER BREW and Design<br>Reg. No. 5054539 | Soft drinks, namely, sodas, Cl 32 | Fountain Square Beverage Concepts | 88 TTABVUE 579-583, Exh 752 |

In view of the dictionary and admissible third-party registrations of record, we find Opposer's MADE IN NATURE trademark to be highly suggestive. *See* the discussion below regarding the effect of this finding on our analysis of the similarity or dissimilarity of the marks.

### 2. Commercial Strength

We now turn to Opposer's arguments and evidence that its MADE IN NATURE marks have acquired commercial strength and are famous through use and recognition in the marketplace.[35] Likelihood of confusion fame varies along a spectrum from very strong marks to very weak marks. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017). A famous mark is commercially strong and has extensive public recognition and renown. *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Kenner Parker Toys Inc. v. Rose Art Indus. Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). A mark is considered "famous" for likelihood of confusion purposes when "a significant portion of the relevant consuming public … recognizes the mark as a source indicator." *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). Such a mark "'casts a long shadow which competitors must avoid.'" *Bridgestone Ams. Tire Operations LLC v. Fed. Corp.*, 673 F.3d 1330, 102 USPQ2d 1061, 1063 (Fed. Cir. 2012) (quoting *Kenner Parker Toys*, 22 USPQ2d at 1456).

---

[35] Opposer's Brief, 103 TTABVUE 25-28; Opposer's Reply Brief, 117 TTABVUE 11-15.

Because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1720 (Fed. Cir. 2012) (citing *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007)).

Fame (for likelihood of confusion purposes) may be measured indirectly by the volume of sales and advertising expenditures in connection with the goods sold under the mark, and other factors such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the goods identified by the mark; and the general reputation of the goods. *Weider Publ'ns*, 109 USPQ2d at 1354; *see also Bose,* 63 USPQ2d at 1308 (recognizing indirect evidence as appropriate proof of strength). Raw numbers alone may be misleading, however. Thus, some context in which to place raw statistics may be helpful, for example, market share or sales or advertising figures for comparable types of goods. *Bose*, 63 USPQ2d at 1309.

On the other hand, the U.S. Court of Appeals for the Federal Circuit clarified in *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1681, 1690-91 (Fed. Cir. 2018) that market share evidence is not a *sine qua non* to place advertising and sales figures in context. Rather, sufficient contextual evidence consists of a showing of the type and extent of advertising and promotions a party uses to demonstrate that the consuming public has been regularly exposed to its marks on a nationwide scale. *Id.*

The products sold under the MADE IN NATURE marks trace their origins to the organic fresh produce business started by Opposer's predecessor-in-interest in 1989.[36] Opposer states that MADE IN NATURE has been used as a common law mark by Opposer's "predecessors in title, in commerce at least as early as 1996 …."[37] Opposer's present product line advertised and sold in connection with its MADE IN NATURE marks includes organic dried fruit, organic toasted coconut chips, organic dried vegetables, organic dried fruits and nuts, organic unbaked energy balls, chocolate covered fruit, fresh fruit and organic cacao fudge.[38] Opposer estimates that the number of individual U.S. retail outlets selling products under the MADE IN NATURE marks currently ranges between 10,000 and 11,000.[39]

From 2018 to 2020, Opposer's confidential annual net revenues for MADE IN NATURE products have ranged from the mid- to high- tens of millions of dollars.[40] Opposer's confidential annual advertising expenditures, not including promotional markdowns, have ranged in the multiple millions of dollars.[41]

Opposer advertises the goods it offers under the MADE IN NATURE marks through print media, print flyers and physical signage (including bus and metro signage and billboards), videos, social media and other types of online media

---

[36] Brent Discov Depo, 90 TTABVUE 10.

[37] Opposer's Int. Ans. No. 16, A NOR2, 93 TTABVUE 31, 58, 84, 113-14.

[38] Brent Decl, 79 TTABVUE 5-6, 143-47, ¶ 8, Exh 12; Opposer's Int Ans No 1, A NOR2, 93 TTABVUE 17, 44, 70, 97, 124-27.

[39] Brent Decl, 79 TTABVUE 18.

[40] Brent Decl, 78 (Confd'l) TTABVUE 10, ¶ 20.

[41] *Id.* at 13, ¶ 29.

(including Facebook, Instagram, Twitter and Opposer's own website), at trade shows and at farmers' markets.[42] We have a few observations about Opposer's advertising efforts. Opposer did not provide evidence regarding the extent or reach of these activities (e.g., the volume and geographical extent of the readership of the print media in which Opposer's advertisements and flyers have appeared, the extent and distribution of Opposer's physical signage, and the length of time over which these advertisements have been placed). Moreover, the viewership of Opposer's advertising on social media and other types of online media has been appreciable but not substantial.[43]

Opposer touts the unsolicited media attention the MADE IN NATURE brand has received in various media outlets, including in specialized magazines and on national television shows, and the industry awards given to MADE IN NATURE products.[44] However, Opposer did not provide the volume and geographic extent of the readership of the articles and other media in which Opposer's MADE IN NATURE brand was recognized. Further, the articles provided were sporadic over the coverage period (1992-2020), and contained items that we do not consider "unsolicited media attention," such as press releases, company/product acquisitions, trade show

---

[42] Brent Decl, 79 TTABVUE 13-15, 153-170, 173-242, ¶¶ 30-35, Exhs 18, 20-25; O NOR 81 136-39, 351-414, Exhs 248-94.

[43] Brent Testim Decl, 78 TTABVUE 14, ¶ 31: Opposer's "Facebook page as of June 2020 has over 206,000 followers and over 207,000 people who "Like" the page. [Opposer's] … Instagram account has over 22,000 followers, and [Opposer's] … Twitter account has over 2,000 followers, as of June 2020."

[44] Brent Decl, 79 TTABVUE 15-39, 243-348, 497-506, ¶¶ 36-39, Exhs. 26, 31; O NOR, 81 TTABVUE 49-135, 152-157, 170-187, 189-207, Exhs 232-63).

attendance and employee hires. In this category, we do credit the articles Opposer made of record consisting of industry reports and some product reviews. In his Declaration, Mr. Brent did not discuss the significance of the industry awards the MADE IN NATURE brand has received as having an impact upon consumer recognition.

Opposer also did not provide viewership statistics (e.g., Nielsen ratings) for the television shows in which MADE IN NATURE products have appeared; however, given the general availability and popularity of these network television shows, we credit Opposer's comment that they reached "millions of viewers" (e.g., *The Today Show, Good Morning America* and *The Tonight Show with Jimmy Fallon*).[45]

Applicant argues that Opposer's MADE IN NATURE marks are not famous and that we should discount Opposer's evidence of commercial strength.[46] However, Applicant did not submit any evidence of relevant third-party marks or trade names **used** in connection with products that are identical or similar to, or competitive with, Opposer's identified goods. Additionally, Applicant criticizes Opposer's "fame" evidence on the following bases: (1) Opposer did not provide sufficient context for its sales figures and promotional expenses (such as market share), (2) Opposer's sales and advertising figures were inflated by "creative accounting," and were insufficiently

---

[45] Brent Decl, 79 TTABVUE 15-16 ¶ 37.

[46] Applicant's Brief, 115 TTABVUE 32-35.

detailed, (3) Opposer's figures do not establish a sufficient amount of sales or advertising to achieve fame in the marketplace.[47]

Opposer responds to Applicant's criticisms as follows: (1) Applicant confuses the "fame" standard for dilution (an either/or proposition) versus likelihood of confusion purposes (on a spectrum), citing *Joseph Phelps Vineyards*, 122 USPQ2d at 1734, (2) Applicant mischaracterizes the law regarding the requisite "context" necessary to substantiate sales and advertising figures, citing *Bose Corp.*, 63 USPQ2d at 1305, and *Omaha Steaks*, 128 USPQ2d at 1690-91, and in any event Opposer provided sufficient context by way of media coverage, social media reach, and awards received, (3) the accounting by which Opposer provided its sales and advertising figures was sufficiently justified and accurate, and (4) the quality and quantity of evidence Opposer provided establishes a level of fame at the higher end of the spectrum.[48]

### 3. Summary as to the Strength of Opposer's Marks

Having considered the record in its entirety and the arguments of the parties, we find that, conceptually, Opposer's MADE IN NATURE marks are highly suggestive, because they bring to mind a quality of the goods for which the marks are registered – all natural without added man-made ingredients. *See Am. Lebanese Syrian Assoc. Charities, Inc. v. Child Health Rsch. Inst.*, 101 USPQ2d 1022, 1029 (TTAB 2011) ("Cure4Kids" when used in connection with "medical and scientific research in the field of children's health" and "fund raising in support of funding research into cures

---

[47] Applicant's Brief, 115 TTABVUE 32-35.

[48] Opposer's Rebuttal Brief, 117 TTABVUE 11-12.

for childhood diseases" is highly suggestive because it describes the purpose of the fund raising and medical research (*i.e.,* to cure children)).

Despite their suggestiveness, because Opposer's marks are registered and are not subject to any counterclaims for cancellation, the marks are entitled to the presumptions accorded by Trademark Act Section 7(b), 15 U.S.C. § 1057(b) (i.e., prima facie evidence of the validity of the registered marks and of the registration of the marks, of the ownership of the marks, and of the owner's exclusive right to use the registered marks in commerce on or in connection with the goods specified in the registrations). Thus, Opposer's marks cannot be treated as merely descriptive; at worst the wording in Opposer's marks may be viewed as highly suggestive. Further, even if Opposer's marks are inherently weak, that is not fatal to a finding of likelihood of confusion because even weak marks are entitled to protection against confusion. *King Candy*, 182 USPQ at 109; *Am. Lebanese Syrian Assoc. Charities*, 101 USPQ2d at 1029.

Moreover, Applicant has not demonstrated that Opposer's marks are commercially weak. The third-party registrations Applicant introduced, "with no evidence of the extent of the use of the marks in commerce, do not diminish the commercial strength of [Opposer's] mark[s]. … The existence of these registrations is not evidence of what happens in the market place or that customers are familiar with them ...'" *Sock It To Me*, 2020 USPQ2d 10611, at *9 *quoting AMF Inc. v. Am. Leisure Prods., Inc.*, 474 F.2d 1403 , 177 USPQ 268, 269 (CCPA 1973). "Applicant's citation of third-party registrations as evidence of marketplace weakness 'is unavailing

because third-party registrations standing alone, are not evidence that the registered marks are in use on a commercial scale, let alone that consumers have become so accustomed to seeing them in the marketplace that they have learned to distinguish among them by minor differences.'" *In re Embiid*, 2021 USPQ2d 577, at *34 (TTAB 2021) (quoting *In re Morinaga Nyugyo K.K.*, 120 USPQ2d 1738, 1745 (TTAB 2016) (also citing *AMF*)).

In sum, the quality and quantity of evidence Opposer provided regarding the commercial strength of its MADE IN NATURE marks, while showing that the marks have acquired marketplace recognition in connection with the products for which they are registered, does not demonstrate that Opposer's marks are famous. "[A] mark's renown within a specific product market is the proper standard [for proving the commercial strength of a mark,]" *Palm Bay Imps.*, 73 USPQ2d at 1694, and "warrants reasonable [and appropriate] weight, among the totality of the circumstances." *Joseph Phelps*, 122 USPQ2d at 1735. Rather, given the limitations we discussed above regarding Opposer's evidence, we find Opposer's marks are of moderate commercial strength for those goods.

**B.    The Similarity or Dissimilarity of the Parties' Marks**

We now consider the similarity or dissimilarity of the parties' marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay Imps.,* at 73 USPQ2d at 1691 (quoting *DuPont*, 177 USPQ at 567). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d at 1746 (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)).

"The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *In re i.am.symbolic*, 123 USPQ2d at 1748 (quoting *Coach Servs.*, 101 USPQ2d at 1721 (internal quotation marks omitted)). The focus is on the recollection of the average purchaser – here a potential purchaser of food and beverage products[49] – who normally retains a general rather than a specific impression of trademarks. *In re Assoc. of the U.S. Army*, 85 USPQ2d 1264, 1268 (TTAB 2007); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975); *see also In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) ("marks must be considered in light of the fallibility of memory and not on the basis of side-by-side comparison") (cleaned up; citation omitted).

So long as we "analyze[] the marks as a whole[, i]t is not improper for the Board to determine that, 'for rational reasons,' … [we] give 'more or less weight ... to a particular feature of the mark[s]' provided that … [our] ultimate conclusion regarding … likelihood of confusion 'rests on [a] consideration of the marks in their entireties.'" *Quiktrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 2021 USPQ2d 35, *2-3 (Fed. Cir. 2021) *quoting Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d

---

[49] When considering Applicant's arguments regarding the weakness of Opposer's marks, we are necessarily focused on the identifications of goods in Opposer's registrations; whereas, when considering likelihood of confusion our focus must be broader, because Applicant's identifications are broader in scope.

1352, 1357 (Fed. Cir. 2000) and *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985).

We begin by recognizing the obvious: Opposer's MADE IN NATURE marks and Applicant's NATURE MADE mark share the terms "MADE" and "NATURE," simply in reverse or transposed order.[50] Marks that include "reverse combinations" of the same words or elements or a "transposition" of the most important words comprising the marks have been found to be similar. *See Bank of Am. Nat'l Trust and Sav. Ass'n v. Am. Nat'l Bank of St. Joseph*, 201 USPQ 842, 845 (TTAB 1978) ("the words 'BANKAMERICA' and 'BANK OF AMERICA', on the one hand, and 'AMERIBANC', on the other, convey the same meaning and create substantially similar commercial impressions").

Where transposed marks convey similar commercial impressions, likelihood of confusion is ordinarily found. *See Carlisle Chem. Works, Inc. v. Hardman & Holden*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) (reversing dismissal of oppositions to registration of COZIRC based on use of ZIRCO for related goods, finding that the marks "are substantially similar, the difference being in a reversal of syllables which are essentially the same"); *Royal Crown Cola Co. v. Bakers Franchise Corp.*, 150 USPQ 698, 700 (TTAB 1966), *aff'd*, 404 F.2d 985, 160 USPQ 192 (CCPA 1969) ("[T]he applicant's compound mark includes the same words which make up opposer's mark, that is to say 'RITE DIET' is merely 'DIET-RITE' transposed. The marks of the

---

[50] As Opposer's Mr. Brent testified: the marks "share the two words, 'made' and 'nature,' just [in] reversed order, and dropping … [the] preposition – 'in.'" Brent Testim CX Depo, 104 TTABVUE 54.

parties create substantially the same commercial impressions ....”); *In re Nationwide Indus. Inc.*, 6 USPQ2d 1882, 1884 (TTAB 1988) (RUST BUSTER vs. BUST RUST: “we agree with the Examining Attorney that the marks create substantially similar commercial impressions”); *Plus Prods. v. Physicians Formula Cosmetics, Inc.*, 198 USPQ 111, 114 (TTAB 1978) (“Use of identical terms in inverse order [FORMULA PLUS and PLUS FORMULA] as we have in the present case is likely to cause confusion in trade when used on such closely related cosmetic products”); *Fisher Sci. Co. v. Ipco Hosp. Supply Corp.*, 165 USPQ 471, 472-73 (TTAB 1970) (sustaining opposition to MIX O THERM based on THERMIX used for identical goods, stating “they are in their essentials merely reverse combinations of the same words, and such being the case, would more than likely convey substantially the same commercial impressions”).

We further find that the presence of the term “IN” within Opposer’s MADE IN NATURE marks does not distinguish them from Applicant’s NATURE MADE mark for likelihood of confusion purposes. “[T]he presence of an additional term in the mark does not necessarily eliminate the likelihood of confusion if some terms are identical.” *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1260-61 (Fed. Cir. 2010) (finding ML in standard characters confusingly similar to ML MARK LEES in stylized form). *See also Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014) (finding STONE LION CAPITAL confusingly similar to LION and LION CAPITAL); *In re Denisi*, 225 USPQ 624, 624 (TTAB 1985) (“[I]f the dominant portion of both marks is the same, then confusion

may be likely notwithstanding peripheral differences."). In this case, the peripheral difference of the presence or absence of the term "IN" fails to distinguish the parties' marks.

We further find that the presence of the descriptive, disclaimed term "ORGANIC" in some of Opposer's marks does not differentiate the parties' marks.[51] *Cunningham*, 55 USPQ2d at 1846 ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") *quoting In re Nat'l Data*, 224 USPQ at 752).

We moreover find insignificant the stylization and design elements in Opposer's asserted ORGANIC MADE IN NATURE word-and-design marks:[52] (1) the term ORGANIC in a script font, (2) the presence of the stylized term ORGANIC shown sideways within a black, vertical rectangle on the left-hand side, (3) the stacked presentation and stylized font of the terms MADE IN NATURE, and (4) the term "IN" shown sideways within the marks do not set apart their overall commercial impression from Applicant's NATURE MADE mark in the minds of consumers. To the extent elements in the mark could be considered design elements, "[i]n marks 'consisting of words and a design, the words are normally accorded greater weight because they are likely to make a greater impression upon purchasers, to be remembered by them, and to be used by them to request the goods.'" *Sabhnani,* 2021

---

[51] The disclaimed term "ORGANIC" is present in each of Opposer's asserted marks in Reg. Nos. 3528252, 3528251, 3537789, 4813368, 4898945, 5137879, 3540942 and 5961771.

[52] The noted design elements are present in each of Opposer's asserted marks in Reg. Nos. 3528252, 3528251, 4813368, 4898945, 5137879 and 5961771.

USPQ2d 1241, at *31 *quoting In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1184 (TTAB 2018); *see also, In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012) ("[T]he verbal portion of a word and design mark likely will be the dominant portion. … [T]he verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed.") (cleaned up, internal citation omitted); *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1571 (Fed. Cir. 1983). ("[T]he dominant portion of both parties' word-and-design marks sounds the same when spoken. … In this situation, any differences in the design of the marks would not serve to avoid confusion.").

Further, Applicant's NATURE MADE word mark is presented in standard characters in each of the opposed Applications, which "may be presented in any font style, size or color, including the same font, size and color as the literal portions of [Opposer's] mark[s]," *Sabhnani*, 2021 USPQ2d 1241, at *34 (quoting *In re Aquitaine Wine*, 126 USPQ2d at 1186), and in "the same stylization actually used or intended to be used by [Opposer], or one that minimizes the differences or emphasizes the similarities between the marks." *Id.* at *34-35 (quoting *Anheuser-Busch, Inc. v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1823 (TTAB 2015)).

Opposer's Mr. Brent testified that:

> Although the [parties'] marks [NATURE MADE and MADE IN NATURE] use the words in a different order, both marks use the same words in a phrase that means created by or from "nature" and focus on the same characteristic of their respective goods, *i.e.* that they are (or

have been) created naturally. This common meaning presents a similar commercial impression between the marks.[53]

We agree, and apparently so does Applicant's Ms. Hoffman:[54]

> Q. … For purposes of this discussion and looking at the words themselves, does the phrase "Nature Made" have a different meaning than the phrase "Made in Nature"?
>
> A. I'm sure they could be viewed as similar.

As to the first *DuPont* factor, we find the marks are similar in appearance, sound, meaning and commercial impression. In fact, we find the parties' marks to be highly similar. This factor supports a likelihood of confusion.

## C.    The Similarity or Dissimilarity of the Parties' Goods

We now turn to the comparison of the goods at issue, the second *DuPont* factor. In making our determination regarding the similarity of the goods, we must look to the goods as identified in Applicant's applications and Opposer's registrations. *See Stone Lion*, 110 USPQ2d at 1162 (quoting *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("[T]he question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed.")); *see also Paula Payne Prods. Co. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973) ("Trademark

---

[53] Brent Decl, 79 TTABVUE 20, ¶ 44.

[54] Hoffman Discov Depo, 77 TTABVUE 569-70.

cases involving the issue of likelihood of confusion must be decided on the basis of the respective descriptions of goods").

Further, "'the greater the degree of similarity in the marks, the lesser the degree of similarity that is required of the products … on which they are being used in order to support a holding of likelihood of confusion.'" *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1440 (TTAB 2012) (quoting *In re Concordia Int'l Forwarding Corp.*, 222 USPQ 352, 356 (TTAB 1983)). "It is sufficient that the respective goods are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same producer." *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006).

Applicant asserts that "Opposer has not met its burden of demonstrating that consumers would consider the parties' respective goods, under … [their] respective marks, to emanate from the same source."[55] We disagree.

Some of the goods identified in Class 29 and Class 30 of Application Serial Nos. 85862772 and 85862774 are identical to, or (at the very least) are encompassed by, the goods identified in Opposer's MADE IN NATURE registrations.[56] It is sufficient

---

[55] Applicant's Brief, 115 TTABVUE 27.

[56] As to Application Serial No. 85862772, the identical or overlapping goods are "fruit-based meal replacement bars; vegetable-based food bars; … dried fruits, … dried fruit-based snacks; … dried vegetables; … vegetable-based snack foods; [and] fruit-based snack foods" covered by Opposer's Reg. Nos. 4804536, 4813368, 4898945, 4964827, 5137879 and 5156469. As to Application Serial No. 85862774, the identical or overlapping goods are "grain-based food bars also containing fruits, dried fruits … vegetables … and/or chocolate; [and] chocolate …"

for a finding of likelihood of confusion as to a particular class if relatedness is established for any item of identified goods within that class. *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981). Relatedness can be found based on the descriptions in the application and registration without resort to additional evidence. *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) ("While additional evidence, such as whether a single company sells the goods … of both parties, if presented, is relevant to a relatedness analysis …, the important evidence already before [the Board comprises the identifications of goods in] the … application and [cited] registrations.").

Opposer has gone a number of steps further, by providing relatedness evidence as between Opposer's identified goods and Applicant's identified goods in all three of its opposed Applications. Opposer made of record 61 third-party registrations that identify Opposer's types of goods and at least one or several of Applicant's types of products in the identifications of goods.[57] "[U]se-based, third-party registrations, although not evidence that the marks shown therein are in use or that the public is familiar with them, nonetheless have probative value to the extent that they serve to suggest that the goods listed therein are of a kind which may emanate from a single source under a single mark." *Joel Gott Wines LLC v. Rehoboth Von Gott Inc.*, 107

---

covered by Opposer's Reg. Nos. 4804536, 4813368, 4898945, 4964827, 5137879, 5156469, 5921214 and 5961771.

[57] O NOR, 75 TTABVUE 362-797, Exhs 29-90. We do not understand why Opposer duplicated much of this evidence at Brent Decl, 80 TTABVUE 3-197, Exh 28.

USPQ2d 1424, 1432 (TTAB 2013). *See also In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993); *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n.6 (TTAB 1988).

However, as we did with Applicant's third-party registration evidence, we must discount as being of low or no probative value a number of third-party registrations that Opposer submitted which: (1) were issued under Trademark Act Sections 44(e) or 66(a) (and have been active for less than five years), (2) do not show both Opposer's and Applicant's types of goods under the same mark, or (3) recite goods irrelevant to this Opposition. Stripped of the third-party registrations that have no or low probative value, we are left with 31 relevant third-party registered marks that Opposer made of record.[58]

Opposer also made of record 138 third-party websites in which Opposer's types of goods and at least one or several of Applicant's types of goods are promoted for sale. Opposer accompanies this evidence with charts summarizing and directing us to the specific goods shown on each website.[59] Evidence that "a single company sells the

---

[58] Specifically, third-party registrations reciting one or more of Opposer's types of goods (fruits, dried fruits and vegetables (including snack foods and mixes), and chocolate-covered fruit) and Applicant's type of beverage products identified in Application Serial No. 85862776 include Registration Nos. 4384943, 5408759, 5381723, 5705384, 5758095, 5125937, 5712862, 5612878, 4869235, 5744909, 5765692, 5749869, 4952426, 5097978, 5381419, 5783380 and 5590792. *See* O NOR, 75 TTABVUE 362-68, 396-419, 437-43, 445-51, 464-70, 483-90, 531-37, 551-55, 574-601, 642-49, 678-85, 686-91 and 719-24, Exhs 29, 33-35, 38, 39, 42, 45, 52, 55, 58, 59, 61, 66, 71, 72 and 77.

[59] O NOR 75 TTABVUE 798-994, Exhs 91-40; 76 TTABVUE 3-389, Exhs 141-222; 81 TTABVUE 3-48, Exhs 223-231. Again, we do not understand why Opposer duplicated much of this evidence at Brent Decl, 80 TTABVUE 198-350, Exh 29, but we did find helpful the charts Opposer included accompanying the duplicative website evidence.

Specifically, summary charts with supporting website evidence showing Opposer's types of products identified in its asserted registrations and Applicant's food products identified in

goods and services of both parties, if presented, is relevant to the relatedness analysis." *Hewlett-Packard v. Packard Press*, 62 USPQ2d at 1004, *quoted in In re Integrated Embedded*, 120 USPQ2d 1504, 1514-15 (TTAB 2016). For Applicant's and Registrant's identified goods to be related, it is not necessary that they **always** emanate from the same source under the same mark. The fact that they are offered together by various third parties is evidence that "the respective products are related in some manner and/or ... the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Coach Servs.*, 101 USPQ2d at 1722. Opposer's third-party use relatedness evidence meets this standard.

Opposer's evidence of product relatedness goes still further, consisting of testimony from both parties. Opposer's products offered under the MADE IN NATURE Marks are available for sale at various national, regional and local retail outlets across the United States. Opposer's distribution and sales channels for these products include: club stores (e.g., Costco and BJ's Wholesale); grocery stores (traditional grocery store supermarkets such as Kroger, Wegmans, Publix and Safeway); mass merchandise stores (e.g., Walmart and Target); convenience stores

---

Application Serial No. 85862772 may be found at Brent Decl, 80 TTABVUE 199-250; Specifically, summary charts with supporting website evidence showing Opposer's types of products identified in its asserted registrations and Applicant's food products identified in Application Serial No. 85862774 may be found at Brent Decl, 80 TTABVUE 251-304; Specifically, summary charts with supporting website evidence showing Opposer's types of products identified in its asserted registrations and Applicant's beverage products identified in Application Serial No. 85862776 may be found at Brent Decl, 80 TTABVUE 198-340; Opposer also provided a summary chart of the URLs where these websites may be found at Brent Decl, 80 TTABVUE 341-50.

(e.g., 7-Eleven and like stores); natural product stores (e.g., Whole Foods and Sprouts); corporate campus locations (e.g., the campuses of Google and Apple); drug stores (e.g., CVS and Rite-Aid); e-commerce sites (including Opposer's own website, the Amazon storefront, and the independent websites such as iHerb.com, Walmart.com, Costco.com, etc.); and independent distributors (who in turn sell the products to independent food retailers and to larger food chains).[60] Opposer's Mr. Brent testified that his company's MADE IN NATURE products are offered for sale in the following store sections or aisles: fresh produce, baking, better-for-you snacking, dried fruit, check-out, in a brand-block (of all MADE IN NATURE products wherever in the store the retailer decides to put them), and specialty foods (where chocolates might be sold).[61]

Applicant's Ms. Hoffman and Mr. Cohen testified that Applicant's NATURE MADE products sought for registration in the three opposed Applications would be promoted for sale through the same types of advertising media or could be sold in the same types of stores, at the same websites, and in some of the same locations within the brick-and-mortar retail sales locations as are Opposer's MADE IN NATURE identified products.[62] Evidence that the parties' products are promoted for sale through the same modes of advertising or sold in close proximity in the same sections

---

[60] Brent Decl, 79 TTABVUE 7-8, ¶¶ 13-17; 78 (Confd'l) TTABVUE 9-10, 26-60, ¶ 18, Exhs. 13-15.

[61] Brent Decl, 79 TTABVUE 6, ¶ 9; Brent Testim CX Depo, 104 TTABVUE 16-20.

[62] Hoffman Discov Depo, 77 TTABVUE 11-17, 21-22, 37-38, 42 and 90 TTABVUE 195-201; Hoffman Testim Depo, 113 TTABVUE 17-20; Cohen Discov Depo 77 TTABVUE 581-82, 584-91, 594-99 and 92 TTABVUE 21-24, 29-35, 38-41.

or aisles of the same stores, is further proof that the goods are related. *Hunt Foods & Indus., Inc. v. Gerson Stewart Corp.*, 367 F.2d 431, 151 USPQ 350, 53 (CCPA 1966) (Reversing the Board's dismissal of the Section 2(d) opposition: "[T]he respective products often appear side by side in stores and frequently appear in the same advertisements of stores.").

We find the parties' respective goods are identical in part (as to Application Serial Nos. 85862774 and 85862772), and otherwise similar and related (as to all three Applications). The second *DuPont* factor supports a likelihood of confusion.

### D. Similarity or Dissimilarity of the Parties' Trade Channels, Classes of Consumers, Purchasing Conditions and Consumer Sophistication

The third *DuPont* factor assesses the similarity or dissimilarity of the parties' established, likely-to-continue trade channels. *DuPont*, 177 USPQ at 567. Under the fourth *DuPont* factor, we consider "[t]he conditions under which and buyers to whom sales are made, *i.e.*, 'impulse' vs. careful, sophisticated purchasing." *Id*. We note there are no trade channel or class-of-consumer restrictions in any of Opposer's Registrations or Applicant's opposed Applications.

As we observed above, the goods identified in Opposer's Registrations and the goods in Application Serial Nos. 85862774 and 85862772 are identical in part. "[A]bsent restrictions in the application and registration, [identical] goods … are presumed to travel in the same channels of trade to the same class of purchasers.". *In re Viterra Inc.*, 101 USPQ2d at 1908; *Double Coin Holdings, Ltd. v. Tru Dev.*, 2019 USPQ2d 377409, at \*6 (TTAB 2019) (same).

The goods in Application Serial No. 85862776 are not identical in any respect to Opposer's identified goods. However, because there are no limitations as to channels of trade or target purchasers in Opposer's Registrations or this Application, it is presumed that the respective goods would move in all channels of trade normal for the parties' products, and that they are available to all usual purchasers for these goods. *See Citigroup v. Cap. City Bank*, 98 USPQ2d at 1261; *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 199 (Fed. Cir. 1983); *Paula Payne Prods.*, 177 USPQ at 77.

As noted from the evidence and testimony discussed above, there is proof in the record that the trade channels for the goods identified by the parties in their respective registrations and applications overlap, and that these products are directed to the same classes of consumers – potential purchasers of food and beverage products, that is, members of the general public. We find the parties' trade channels and classes of purchasers are presumed to be identical or otherwise overlap.

Applicant further argues that purchasers of the parties' goods are careful and sophisticated, reducing the likelihood that confusion will occur.[63] Opposer argues that the parties' goods are low cost items purchased on impulse without considerable care, increasing the likelihood that confusion will occur.[64]

Because Registrant's identifications of goods in its asserted registrations, and Applicant's identifications of goods in all three of its Applications, do not include any restrictions or limitations as to channels of trade or classes of consumers, the

---

[63] Applicant's Brief, 115 TTABVUE 30-32

[64] Opposer's Brief, 103 TTABVUE 37-38; Opposer's Reply Brief, 117 TTABVUE 19-22.

prospective purchasers for the parties' identified products include a variety of consumers, including consumers that do not have significant knowledge or experience with these food and beverage products. *See Stone Lion Cap. Partners*, 110 USPQ2d at 1163-64 (recognizing Board precedent requiring consideration of the "least sophisticated consumer in the class"); *In re Sailerbrau Franz Sailer*, 23 USPQ2d 1719, 1720 (TTAB 1992) (finding that all purchasers of wine may not be discriminating because while some may have preferred brands, "there are just as likely to be purchasers who delight in trying new taste treats."); *In re Bercut-Vandervoort & Co.*, 229 USPQ 763, 764 (TTAB 1986) (evidence that relevant goods are expensive wines sold to discriminating purchasers must be disregarded, given the absence of any such restrictions in the application or registration).

Opposer's Mr. Brent testified that "products offered under the MADE IN NATURE Marks vary in price based on the size of the packages, but can be as low as $1.99 for the smaller single serve packages."[65] The prices for Opposer's MADE IN NATURE products, as advertised on Opposer's website, range from $5.99 to $22.99.[66] The advertised prices for products competitive to Opposer's identified MADE IN NATURE goods and Applicant's identified NATURE MADE goods are mostly within this range, with some single-serve products advertised at prices a few dollars below

---

[65] Brent Testim Decl, 79 TTABVUE 11, ¶ 24.

[66] *Id.* at 153-170, Exh 18. *See also* O NOR, 81 TTABVUE 140-51, 304-11, Exhs 249, 276.

this range and with gift packages (of multiple items) priced a few to several dollars above this range.[67]

Mr. Brent also testified that purchasers of Opposer's MADE IN NATURE products are members of the general public who do not typically spend much time making purchasing decisions for these types of products, who make their purchasing decisions for these products without the assistance of others (such as seller representatives), and often on impulse if the purchase is made from an end-of-aisle display or at the checkout counter.[68] "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot, Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000); *see also Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 672, 223 USPQ 1281, 1282 (Fed. Cir. 1984) ("Both [parties'] products[, teas,] are relatively inexpensive, comestible goods subject to frequent replacement. Purchasers of such products have been held to a lesser standard of purchasing care."); *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984) (same, as to bread and cheese).

Citing to Mr. Brent's cross-examination testimony, Applicant argues that purchasers of Opposer's products exercise a greater degree of care because they are ingredient conscious, Opposer's products are promoted as being organic, and are thus

---

[67] O NOR, 75 TTABVUE 798-994, Exhs 91-140; 76 TTABVUE 3-389, Exhs 141-222; 81 TTABVUE 3-48, Exhs 223-31; 81 TTABVUE 158-69, 208-303, 312-50, Exhs 252, 264-75, 277-80.

[68] Brent Testim Decl, 79 TTABVUE 11, ¶¶ 25-26.

more expensive than non-organic foods, and that Opposer has no independent proof of Opposer's products being purchased on impulse.[69]

We have concerns with Applicant's reliance on Mr. Brent's cross-examination testimony for this purpose. First, Mr. Brent's commentary says nothing about the sophistication or buying habits of the consumers of Applicant's identified products. Second, as discussed above, even Opposer's products promoted for sale as organic cannot be said to be in such an expensive price range as to suggest a greater degree of purchaser care. Third, an effectual retort to Applicant's arguments, consistent with the decisions we cited above, was neatly summarized by the Board in *Gen'l Mills, Inc. v. Fage Dairy Processing Indus. S.A.*, 100 USPQ2d 1584 (TTAB 2011), *judgment set aside pursuant to settlement*, 110 USPQ2d 1679 (TTAB 2014):

> [G]roceries are generally purchased on impulse at the shelf and the consumer decision is made fairly quickly. … [T]hese goods … are relatively inexpensive. … [P]urchasers of [such] casual, low-cost ordinary consumer items exercise less care in their purchasing decisions and are more likely to be confused as to the source of the goods. … Although some of the parties' more health-conscious consumers may be more careful in their purchase, we must base our decision on the least sophisticated potential purchasers.

*Gen'l Mills*, 100 USPQ2d at 1600.

We disagree with Applicant's argument that consumers would exercise greater purchasing care merely because Opposer's goods are promoted for sale as being "organic" (some specifically identified as such in a portion, but not all, of Opposer's registrations). The average customer of the parties' food and beverage products is an

---

[69] Applicant's Brief, 114 TTABVUE 30-32, citing Brent Testim CX Depo, 104 TTABVUE 38, 66, 70-73.

ordinary consumer, and we see no reason that an ordinary consumer would distinguish the source of different kinds of such goods sold under similar marks. Applicant would have us conclude that consumers will make such a distinction because consumers for organic produce exercise a high degree of consumer case. Except for Mr. Brent's cross-examination testimony, Applicant does not point to any evidence in the record supporting this view. Rather, when the parties' partially identical and otherwise related goods are sold under similar marks in overlapping trade channels, consumers are likely to believe that the products are different lines of products sold by a company specializing in healthful foods.

Applicant's Ms. Hoffman and Mr. Cohen testified regarding the degree of care exercised by consumers of Applicant's currently-sold NATURE MADE products (vitamins, minerals and supplements) as well as Applicant's goods identified in its opposed Applications, observing in regard to the latter that they will be "heavily fortified" (that is, food products providing greater nutrition than a non-fortified food product might provide).[70] This testimony is irrelevant for two reasons. First, Applicant's NATURE MADE vitamins, minerals and supplements are not identified in the opposed Applications, so any purported care exercised by consumers of such products by Applicant does not speak to the consumers' level of care as to the products identified in the opposed applications. Second, the vast majority of food and beverage

---

[70] Hoffman Testim Depo, 113 TTABVUE 17-20, 46-50; 110 (Confd'l) TTABVUE 22-23; Cohen Testim Depo, 109 TTABVUE 37-40, 50-51.

products identified in Applicant's Applications are not limited to those that are nutritionally fortified (whether "heavily" fortified or normally fortified). In sum:

> [We cannot] disregard the broad scope of … [goods] recited in … [Applicant's] [A]pplication[s], and … instead rely on … [marketplace] practices. This would be improper because the … [goods] recited in the [A]pplication[s] determine the scope of the post-grant benefit of registration. "[R]egistration provides the registrant with prima facie evidence of … the registrant's 'exclusive right' to use the mark on or in connection with **the goods … specified in the certificate of registration**." (citations omitted, emphasis original). … Other benefits of registration are likewise commensurate with the scope of the … [goods] recited in the application, not with the applicant's then-existing … [or planned goods]. (citations omitted). It would make little sense for the Board to consider only the parties' current [or planned] activities when the intent-to-use [A]pplication[s], not current [or planned] use, determines the scope of this post-grant benefit. Parties that choose to recite services in their trademark application that exceed their actual services will be held to the broader scope of the application.
>
> * * *
>
> [For this reason, we must] … properly consider[] **all** potential … [consumers] for the recited … [goods], including ordinary consumers …. [Even if] … the … [goods] recited in the [opposed] [A]pplication[s] … [could] encompass sophisticated … [consumers], … [our] decision [is] … to be based "on the least sophisticated potential purchasers." (emphasis original).

*Stone Lion*, 110 USPQ2d 1157, 1162-63. Were we to presume purchaser care and sophistication (which we cannot on this record), "even consumers who exercise a higher degree of care are not necessarily knowledgeable regarding the trademarks at issue, and therefore immune from source confusion." *Top Tobacco LP v. N. Atl. Operating Co.*, 101 USPQ2d 1163, 1170 (TTAB 2011).

The third and fourth *DuPont* factors, trade channels, classes of consumers, purchasing conditions and consumer sophistication, all weigh in favor of likely confusion.

### E.    Absence of Actual Confusion

The seventh *DuPont* factor is the "nature and extent of any actual confusion, while

the eighth *DuPont* factor considers the "length of time during and conditions under

which there has been concurrent use without evidence of actual confusion." *DuPont*,

177 USPQ at 567. Applicant argues:[71]

> Opposer admits there has never been any confusion between these
> marks. ... Nor has Opposer provided any evidence of any kind, even
> anecdotally, to indicate the same. This is despite Applicant's NATURE
> MADE nutritional products being extensively used, marketed, and
> otherwise famous.

Opposer responds:[72]

> [T]he real and only issue of actual confusion involved in analyzing this
> factor is in regard to the only goods actually at issue in these oppositions,
> namely those goods ... [Applicant] listed in ... [Applicant's] Applications.
> Clearly, there is no evidence of actual confusion between the goods
> offered by … [Opposer] under the MADE IN NATURE Marks and the
> goods that ... [Applicant] plans to provide under ... [Applicant's NATURE
> MADE] Applications because ... [Applicant] has not offered any of the
> goods listed in ... [Applicant's] Applications.

"The absence of any reported instances of confusion is meaningful only if the

record indicates appreciable and continuous use by applicant of its mark for a

significant period of time in the same markets as those served by opposer under its

marks." *Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 94 USPQ2d 1645, 1660 (TTAB

2010), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011); *Gillette Can. Inc. v.

Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). In other words, for the absence of

actual confusion to be probative, there must have been a reasonable opportunity for

---

[71] Applicant's Brief 115 TTABVUE 38-39.

[72] 117 TTABVUE 23-24.

confusion to have occurred. *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007).

Opposer readily concedes "[t]here has been no actual confusion to date between … [Opposer's] products offered under the MADE IN NATURE Marks and those product[s] identified in the … [NATURE MADE intent-to-use] Applications."[73] Likewise, Applicant is not aware of any such instances of actual confusion.[74]

The absence of actual confusion is understandable. With two minor exceptions,[75] Applicant has not yet promoted or sold under the NATURE MADE mark the products identified in its opposed intent-to-use Applications.[76] The products Applicant has copiously advertised and sold in connection with its NATURE MADE mark are

---

[73] Brent Testim Decl, 79 TTABVUE 23, ¶ 54.

[74] Hoffman Discov Depo, 90 TTABVUE 31; Applicant's Int. Ans. No. 35, O NOR, 75 TTABVUE 51-52, 71-72, 91-92.

[75] Applicant points to its offer for sale of supplement beverages under the NATURE MADE mark. Applicant's Brief, 115 TTABVUE 39, citing A Amended NOR2, 98 TTABVUE 174-75, Exh 1313. The product is not actually a supplement beverage per se, but rather a supplement delivery pod that is used in connection with a Tespo branded pod delivery system. The powder in the pod is mixed with water and served to the consumer through the Tespo device. The collaboration between Tespo and Applicant was announced in 2019, so the product was not on the market that long, Applicant did not provide information regarding the extent of advertising or sales of its pod product, and the partnership between the two companies was discontinued after disappointing sales. Cohen Testim Depo, 106 TTABVUE 36-37. The other product, mentioned by Ms. Hoffman and Mr. Cohen, is a drink mix in powdered form within a sachet or stick pack (to be mixed with water) called NATURE MADE ImmuneMAX, Hoffman Discov Depo, 90 TTABVUE 191-92, 231-32, Exh 10; Cohen Testim Depo 25-27, 37-40, 108 TTABVUE 2-13, Exh 4. Again, Applicant did not provide information regarding the extent of advertising or sales of the NATURE ImmuneMAX product.

[76] Hoffman Discov Depo, 77 TTABVUE 5-6, and 43-60, Exhs 2-4 (opposed Applications); Applicant's Int. Ans. Nos. 7, 11, 13, 16, 20, O NOR, 75 TTABVUE 40-46, 60-66, 80-86 (stating that inquiries into the channels of trade, geographic areas of sale, target purchasers, and advertising activities for Applicant's identified goods are "premature," that such advertising activities have not yet been conducted and that Applicant **intends** to sell its identified products to a variety of consumers (not that the identified products have actually been sold).

vitamins, minerals, and supplements.[77] With respect to Applicant's current line of NATURE MADE products, Opposer does not consider the parties to be competitors, they do not trade in the same "space," the respective products are promoted for sale in different aisles or sections of stores, and Applicant has "never been on … [Opposer's] radar screen until" the occurrence of the circumstances giving rise to the current Oppositions.[78] These facts readily explain Applicant's contention that "there [has not] been any contact between the parties whatsoever prior to the present Oppositions."[79]

The absence of any reported instances of confusion therefore is not meaningful in this case. The record does not demonstrate appreciable and continuous use by Applicant of its NATURE MADE mark for a significant period of time in the same markets as those served by Opposer under its MADE IN NATURE marks, *Citigroup v. Cap. City Bank*, 94 USPQ2d at 1660; *Gillette Canada*, 23 USPQ2d at 1774, such that there would have been a reasonable opportunity for confusion to have occurred. *Barbara's Bakery*, 82 USPQ2d at 1287.

In any event, evidence of actual confusion is not required to prove a likelihood of confusion. *See Giant Food*, 218 USPQ at 395-96; *Herbko Int'l v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002). We therefore find the seventh

---

[77] Applicant's Brief, 115 TTABVUE 15-19.

[78] Brent Discov Depo, A NOR2, 90 TTABVUE 59-65.

[79] Applicant's Brief, 115 TTABVUE 40.

and eighth *DuPont* factors, the presence or absence of actual confusion under appropriate circumstances, to be neutral in our likelihood of confusion analysis.

## F.   The Variety of Goods on which Opposer's Mark is or is not Used

The ninth *DuPont* factor considers "[t]he variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)." *DuPont*, 177 USPQ at 567. "If a party in the position of plaintiff uses its mark on a wide variety of goods, then purchasers are more likely to view a defendant's related good[s] under a similar mark as an extension of the plaintiff's line." *DeVivo v. Ortiz*, 2020 USPQ2d 10153, at *14 (TTAB 2020). On the other hand, if the plaintiff's "uses are insufficient to persuade us that Opposer has used … [its] mark on a variety of goods …[,] [w]e … [would] find the ninth *DuPont* factor to be neutral with respect to a finding of likelihood of confusion." *Id.* at *15.

Applicant argues "the MADE IN NATURE Marks have only been used on a very narrow category of products."[80] Opposer argues that Applicant "ignores completely the undisputed … evidence of … [Opposer's] extensive use of the MADE IN NATURE Marks to identify a wide range of food and beverage products."[81]

As we noted earlier in this opinion, Opposer's MADE IN NATURE product line currently extends to organic dried fruit, organic toasted coconut chips, organic dried vegetables, organic dried fruits and nuts, organic unbaked energy balls, chocolate

---

[80] Applicant's Brief, 115 TTABVUE 40.

[81] Opposer's Reply Brief, 117 TTABVUE 24.

covered fruit, fresh fruit and organic cacao fudge.[82] Opposer has not shown that its MADE IN NATURE branded goods extend to other product areas.

Opposer's uses of the MADE IN NATURE marks, as established by the record, are insufficient to persuade us that Opposer has used its marks on an extended variety of goods. Given the relatedness of the parties' identified goods, we find it unnecessary to rely on this factor. We therefore find the ninth *DuPont* factor to be neutral with respect to a finding of likelihood of confusion.

### G. The Extent to which Applicant has a Right to Exclude Others

The eleventh *DuPont* factor discusses "[t]he extent to which [the] applicant has a right to exclude others from use of its mark on its goods." *DuPont*, 177 USPQ at 567. Applicant argues:

> Applicant has a high level of consumer recognition, and … its NATURE MADE mark is famous …. Applicant's NATURE MADE products enjoy immense commercial success with [considerable – amount designated confidential] annual sales revenue …, and holding a [significant – percent designated confidential] market share … [in] the vitamin and supplement category in the United States. … [In fact, as shown by the record,] Applicant's NATURE MADE brand has been the #1 recommended vitamin and supplement by pharmacists for over five years. ... Indeed, even Opposer admits the extensive consumer recognition and market dominance of Applicant's NATURE MADE brand. … Accordingly, this factor weighs against a finding of confusion.[83]

Opposer responds:

> Although … [Applicant] has [sub]mitted evidence showing that NATURE MADE is used for vitamins and supplements, that evidence is limited to that niche market and does not establish recognition, or a likelihood of expansion into the foods and beverage field. Moreover, …

---

[82] *Id.* at 5-6, 143-47, ¶ 8, Exh 12; Opposer's Int Ans No 1, A NOR2, 93 TTABVUE 17, 44, 70, 97, 124-27.

[83] Applicant's Brief, 114 TTABVUE 41.

> [Applicant] did not even address, much less provide any evidence to show, that the products listed under in the … [NATURE MADE] Applications are within its zone of natural expansion. Therefore, this factor is neutral.[84]

As noted above, Applicant has made of record evidence of the renown of its registered NATURE MADE mark in connection with vitamins, minerals and supplements. The food and beverage products identified in the opposed intent-to-use Applications are different goods, and clearly are in the nature of a contemplated future brand extension for the goods, the majority of which are not yet in use in connection with the mark. While brand extension is a desirable business goal, Applicant provides no legal support for finding that this recognition of its registered mark for different goods provides Applicant any right to exclude others from using the NATURE MADE mark, or similar marks, on food and beverages. *See Jackes-Evans Mfg. Co. v. Jaybee Mfg. Corp.*, 481 F.2d 1342, 179 USPQ 81, 83 (CCPA 1973) ("There is no right to register one's mark on an expanded line of goods where the use of the mark covered by such registration would lead to a likelihood of confusion, mistake or deception" with the prior trademark rights of opposer.); *Am. Hygienic Lab'ys Inc. v. Tiffany & Co.*, 12 USPQ2d 1979, 1984 (TTAB 1989) ("[W]hile there is no doubt that applicant has priority of use of its [registered] marks on a wide array of products (jewelry, crystal, china, etc.), we do not believe that this use may be relied on to establish priority with respect to the specific cosmetic and toiletry products in its application.").

---

[84] Opposer's Reply Brief, 117 TTABVUE 25-26.

The eleventh *DuPont* factor, the extent to which Applicant has a right to exclude others from use of its mark on its goods (in the instant application), does not assist Applicant in this Opposition. We therefore find the eleventh *DuPont* factor to be neutral with respect to likelihood of confusion.

## H.    The Extent of Potential Confusion

The twelfth *DuPont* factor discusses "[t]he extent of potential confusion, i.e., whether *de minimis* or substantial." *DuPont*, 177 USPQ at 567. Applicant argues that "in light of (1) the differences in the marks; (2) the 'weakness' of Opposer's marks; and (3) differences in the respective trade channels, [and] … the other [likelihood of confusion] factors [Applicant] analyzed [elsewhere in its brief], the potential for confusion is, at most, *de minimis*, and does not rise to the **likelihood** of confusion standard in any case." (emphasis Applicant's).[85] Opposer argues "the *DuPont* factors demonstrate a likelihood of consumer confusion between use of the NATURE MADE mark for the food and beverage products in the … [opposed] Applications and the MADE IN NATURE Marks used by Opposer with food products" (then proceeding to summarize its prior arguments).[86]

The premises on which Applicant argues the absence of a likelihood of confusion all fail, in view of our findings above: the parties' marks are similar; while Opposer's marks are conceptually weak, they are afforded the benefits of federal registration and are of commercially moderate strength; and the parties' trade channels and

---

[85] Applicant's Brief, 115 TTABVUE 41.

[86] Opposer's Brief, 117 TTABVUE 26.

classes of purchasers are presumed to be identical or otherwise overlap. As summarized below, we find the likelihood of confusion in this case to be substantial. The twelfth *DuPont* factor, the extent of potential confusion, weighs in favor of likely confusion.

### I. Any Other Established Fact Probative of the Effect of Use

The thirteenth *DuPont* factor considers "[a]ny other established fact probative of the effect of use." *DuPont*, 177 USPQ at 567. Applicant used the opportunity of discussing the thirteenth *DuPont* factor to argue in its brief the *Morehouse* defense that was not raised in its Answers to the Notices of Opposition.[87] As we previously discussed, Applicant did not timely raise the *Morehouse* defense, and in any event, this defense does not apply to the facts of record. Applicant has not established any other facts probative of the effect of use.

### J. Likelihood of Confusion: Summary and Conclusions

Opposer's MADE IN NATURE marks are conceptually weak, but are imbued with the benefit of federal registration; and Opposer's marks are of moderate commercial strength. The parties' marks, MADE IN NATURE and NATURE MADE are highly similar. The parties' goods, as identified in Opposer's Registrations and the opposed Applications, are identical in part (as to Application Serial Nos. 85862774 and 85862772), and related in part (as to all three Applications). The parties' trade channels and classes of purchasers are presumed to be identical or the evidence establishes that they otherwise overlap.

---

[87] Applicant's Brief, 115 TTABVUE 42-47.

Purchasers of Opposer's MADE IN NATURE products are members of the general public who do not typically spend much time making purchasing decisions for these types of products, who make their purchasing decisions for these products without the assistance of others (such as seller representatives), and often on impulse. The extent of potential confusion, should Applicant's opposed Applications be allowed to proceed to registration, is significant.

On the record before us, the absence of actual confusion, the limited variety of goods on which Opposer's MADE IN NATURE marks are used, and the extent to which Applicant has a right to exclude others from use of its NATURE MADE mark on its goods are neutral factors in our analysis. Applicant's *Morehouse* defense, untimely asserted for the first time in its brief, does not apply here.

Balancing these factors for which there has been evidence and argument, we find Opposer has demonstrated by a preponderance of the evidence that confusion is likely.

**Decision:**

The Oppositions to registration of Applicant's NATURE MADE mark in Application Serial Nos. 85862774, 85862772 and 85862776 under Trademark Act Section 2(d) are sustained.